## KING VS. HAYNES et al.

1. SURETY: *Discharge of: Extension of time to principal.*
   In order that an agreement between a creditor and principal debtor extending the time of payment, shall have the effect of discharging the surety, the extension must be for a definite period. It makes no difference how short the time, it must be fixed.

2. SAME: *Notice to creditor to sue.*
   Where a surety claims a discharge from a failure of the creditor to sue the principal debtor after notice to him to sue, and the subsequent insolvency of the debtor, the surety must show clearly the nature and terms of the notice.

APPEAL from *Drew* Circuit Court in Chancery.

Hon. T. F. SORRELLS, Circuit Judge.

*Jackson, Rose,* for appellants.

*McCain, contra.*

EAKIN, J. On the fifth of August, 1872, complainant, Haynes, became surety for William P. Montague in a note to defendant King, for $741.88, due February 15, 1873, and to bear interest at the rate of 15 per cent. per annum after maturity. As a further security, complainant executed to King a mortgage of certain lands, with power of sale for the payment of the debt on default. It was well known to King that complainant executed the note and mortgage merely as surety for Montague, to enable him to borrow money.

Afterwards, Montague, without the knowledge or consent of his said surety, executed, and King took from him, the following instrument:

"MONTICELLO, ARK., August 9, 1873.

"I hereby agree to bind myself, my heirs and assigns,

firmly to Matthew J. King, to pay him twenty per cent. (20 per cent.) interest per annum on a certain joint note executed by myself and Eli K. Haynes, said note being a mortgage note concerning certain lands described in said mortgage, recorded in the clerk's office in the county of Drew, said rate of interest to date from the —— day of ——, A. D. 1873.

"W. P. MONTAGUE."

At this time Montague was entirely solvent. How long he remained so is not shown, but early in 1876 he had become insolvent. Several payments in money had been made by him, and an account for merchandise was to be credited, concerning all which there is no controversy. About that time King sold the property under the power in the mortgage, and through an agent purchased it in for himself for the balance of the debt.

On the thirteenth of June, 1877, Haynes, the surety, together with several others to whom he had meanwhile sold the land, in separate parcels, with covenants of warranty, filed this complaint in equity against King, Montague and the agent and attorney of King, who had purchased the land at the sale.

It states the facts as above recited, and charges that King, without the knowledge or consent of the surety, had made a contract with the principal for extension of time of payment for one year, upon the consideration of an agreement on the part of the latter to pay an additional interest of 5 per cent. per annum; and, also, that the surety had repeatedly requested King to sue the principal upon the debt whilst he was solvent, and that he had neglected to do so, until the insolvency occurred, whereby a loss would accrue to the surety, if the mortgage were enforced. They pray that the sale may be set aside, and King and his agent be

enjoined from asserting title thereunder; that the mortgage and note be canceled, and their title quieted. .

King, in his answer, positively denies that he made any contract for forbearance; or that Haynes requested him to sue. He claims nothing under the sale, admitting that the purchase was made for him; and makes his answer a cross-bill, seeking foreclosure of the mortgage, for the balance due, under the orders of the court. The agent disclaims all interest. Reply was made.

Besides the instrument above set forth, the evidence upon the contested points is substantially as follows:

Montague, the principal, says that "after maturity of this note, I made a contract with M. J. King, in writing, to give me further time for the payment of said note, in consideration that I would pay 20 per cent. per annum on said note instead of 15 per cent., as stipulated in said original note," a copy of which agreement is referred to in the amended bill. He says further that his surety, Haynes, had no knowledge of this agreement, which is the same as that above recited. He proves that he was solvent at that time, and insolvent at the time of the sale, in 1877, and so remains.

Haynes, the surety, says that he had no knowledge of any contract between Montague and King for an extension of time, until after the sale in 1877, when he was informed of it by Montague. He says: "I afterwards spoke to Mr. King about the matter, and he admitted to me that he had made a different contract from the original contract with Montague, whereby Montague agreed to pay him a greater amount of interest than that specified in the original contract, in consideration of an extension of time for the payment of the same."

Upon the other point he says: "At divers times between

30

the maturity of said note of Montague and the day of the sale of the lands mentioned, * * * I saw Mr. King and urged him to make the money out of Montague on said note, and told him that I had sold the lands, or a part of them, included in the mortgage, and wanted the debt collected so as to remove all incumbrance. I urged upon King the fact that Montague was merchandising and that it was a risky business, and King told me that he was trading with Montague and thought he would get out of him all the money due on this note." The lands at the sale brought $490. Montague remained solvent until a short while before the sale. He meant, when he was urging King to close up the matter, that he desired him to collect the money or bring suit on the note. Does not recollect when he first gave this notice, nor who, nor whether any one was present. The notice was verbal. Witness was not able to pay the money and bring suit himself. Did not know of Montague's insolvency until about the time of the sale, or first of April, 1877. In speaking of the contract between Montague and King, which he says both told him of, he refers to that exhibited. He says that he did not understand from either of the parties that it was taken in lieu of the original contract, or in satisfaction of it, but that it was made for an extension of time.

King, the creditor, says that Haynes "at one time spoke to me and said that he had sold a part of these lands, and wanted me to get other security from Montague and release them; and this is the only time he ever spoke to me about the matter, to my recollection, and this I am positive about. In January, 1877, Judge Haynes asked me how I was getting along in collecting the mortgage note, and said he was afraid he would suffer by the matter, and asked me

King vs. Haynes et al.

to push it up as fast as possible, or something to that amount."

With regard to the agreement for extension, he says that he never had any other or different one from that in the writing exhibited. Concerning it, he says: "I was after Mr. Montague for some money on this note at one time, and he paid me part and agreed to pay me five per cent. interest more on the note; and he made out the agreement referred to in exhibit "B" and gave it to me. Montague said, at the time, that he was in business, and it would cripple him to pay at that time, and he would rather do this than pay at that time. This agreement was not intended to affect the original note."

There was no other evidence throwing any material light on the transactions.

Upon hearing, the Chancellor found that there had been a contract for an extension of time, without the consent of the surety. Whereupon, " and upon consideration of the other facts appearing from the testimony," it was decreed that the note and mortgage, so far as they affected the complainants, be canceled, and that the sale under the mortgage be annulled, and that defendant pay the costs. From this decree King appeals.

In the case of *Thompson et al. v. Robinson, Sheriff, 34 Ark., 44*, this court adopted the rule that "in order that an agreement between a creditor and principal debtor, extending the time of payment, shall have the effect of discharging the surety, the extension must be for a definite period. It makes no difference for how short a period the time is extended, but that period must be fixed, otherwise the hands of the creditor are not tied, and he may proceed at any time."

The rule approved by a great many authorities is, that,

1. SURETY: Discharge of. Extension of time to principal.

" if the creditor enters into any *binding* contract, the effect of which will be to *give further time* to the debtor, without consulting the surety, the surety will be thereupon discharged." The reason for this rule, as stated by Lord ELDON, in *Samuel v. Howarth, 3 Mer., 272,* is, " because the creditor, by so giving time to the principal, has put it out of the power of the surety to consider whether he will have recourse to his remedy against the principal or not, and because he, in fact, can not have the *same* remedy against the principal as he would have had under the original contract. (See the question discussed and numerous authorities cited in the notes to case of *Rees v. Berrington, White & Tudor's Leading Cases in Equity, Vol. II, Part II, p. 1867.*) Lord ELDON, in the case above cited, says the extension of time must be by *positive contract.*

Upon consideration of the written instrument, we find nothing in it, whether by condition, recital, or implication, which has any allusion to an extension of time.

The instrument itself is incomplete and uncertain as it appears in the transcript—so much so that without extraneous proof, it would not be enforced against Montague, himself, either in law or equity. The point of time from which the additional interest is to run is not given. All the evidence concerning the supposed extension of time given by King, relates to this instrument, and there is no proof whatever of any other contract for that purpose. Doubtless King was willing to take the additional per centage and rest upon his security, but that would not release the surety, in the absence of any binding contract which could interfere with any rights the surety might deem it proper to assert. We think his Honor, the Chancellor, was mistaken in supposing that this case came within the reason of the rule for the release of the surety.

King vs. Haynes et al.

Although the Chancellor made his decree upon this ground, it is urged here, by counsel for appellee, that upon general equitable principles, independent of the statute requiring notice, in writing, the surety was released by the failure of King to sue upon verbal notice, and the subsequent insolvency of the principal. And he relies upon the case of *Hempstead & Conway v. Watkins, 6 Ark., 353.*

The burden of proof of such notice lies upon the surety, and he must show clearly the nature and terms of the notice, in order to invoke the authority of that case, to deprive the creditor of his legal rights. This is not done. The testimony is balanced; and even if that of the complainant be taken, alone, falls short of that certainty as to time and terms, which a court of equity would require, in order to visit the creditor with the penalty of a forfeiture for laches.

We think the court erred in giving the relief to complainants, and in denying the relief sought by the crossbill. All parties interested were before the court, and it should have taken an account of the balance due upon the note and decreed a foreclosure of the deed of trust in favor of the complainant in the cross-bill. To that end, let the decree be reversed, and the cause remanded, with instructions to the court below to enter a decree for foreclosure, as herein indicated, and to execute the same in accordance with the practice in equity, and this opinion.